**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

| | |
|---|---|
| JAMES R. BLACKMON, JUSTIN M. ROZELLE, ERIC A. MYERS, and JERED MUNSON Individually and as representatives of a class of similarly situated persons, on behalf of the ZHI 401(K) RETIREMENT SAVINGS PLAN, | Case No: 5:20-cv-00988 |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| ZACHRY HOLDINGS, INC., THE COMPENSATION AND BENEFITS COMMITTEE OF ZACHRY HOLDINGS, INC.; and DOES No. 1-10, Whose Names Are Currently Unknown, | |
| Defendants. | |

## I.    INTRODUCTION

1.      Plaintiffs James R. Blackmon ("Blackmon"), Justin M. Rozelle ("Rozelle"), Eric

A. Myers ("Myers"), and Jered Munson ("Munson") (collectively, "Plaintiffs"), individually and

as participants of the ZHI 401(k) Retirement Savings Plan ("Plan"), bring this action under 29

U.S.C. § 1132, on behalf of the Plan and a class of similarly-situated participants and

beneficiaries of the Plan, against Defendants, Zachry Holdings, Inc. ("Zachry"), the

Compensation and Benefits Committee of Zachry Holdings, Inc. ("Administrative Committee"

or "Committee"), and Does No. 1-10, who are members of the Administrative Committee or

other fiduciaries of the Plan and whose names are currently unknown (collectively,

"Defendants"), for breach of their fiduciary duties under the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*., and related breaches of applicable law

beginning six years from the date the initial complaint was filed and continuing to the date of

judgment (the "Class Period").  This Second Amended Class Action Complaint is filed pursuant to Fed.R.Civ.P. 15(a)(2) and agreement of the parties.

2.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e., 401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

3.      The importance of defined contribution plans to the United States retirement system has become pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

4.      As of December 31, 2019, the Plan had 16,832 participants with account balances and assets totaling approximately $919 million, placing it in the top 0.2% of all 401(k) plans by plan size.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for administration of 401(k) plans and the investment of 401(k) assets.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

5.      Defendants maintain the Plan, and are responsible for selecting, monitoring, and retaining the service provider(s) that provide investment, recordkeeping, and other administrative

---

[1] The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017 (pub. August 2020).

services.  Defendants are fiduciaries under ERISA, and, as such, are obligated to (a) act for the exclusive benefit of participants, (b) ensure that the investment options offered through the Plan are prudent and diverse, and (c) ensure that Plan expenses are fair and reasonable.

6.      Defendants have breached their fiduciary duties to the Plan and, as detailed below, have engaged in, *inter alia*, the following fiduciary breaches: (1) failed to fully disclose the expenses and risk of the Plan's investment options to participants; (2) allowed unreasonable expenses to be charged to participants; and (3) selected, retained, and/or otherwise ratified high-cost and poorly-performing investments, instead of offering more prudent alternative investments when such prudent investments were readily available at the time that they were chosen for inclusion within the Plan and throughout the Class Period (defined below).

7.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiffs bring this class action under ERISA Sections 404, 409 and 502, 29 U.S.C. §§ 1104, 1109 and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiffs seek such other equitable or remedial relief for the Plan and the proposed class defined below (the "Class") as the Court may deem appropriate and just under all of the circumstances.

8.      Plaintiffs specifically seek the following relief on behalf of the Plan and the Class:

a.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

b.      A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

c.      Equitable, legal or remedial relief for all losses and/or compensatory damages;

d.      Attorneys' fees, costs and other recoverable expenses of litigation; and

e.      Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.      THE PARTIES

9.      Blackmon is a former employee of Zachry and former participant in the Plan under 29 U.S.C. § 1002(7).  Blackmon is a resident of Lexington, North Carolina.

10.     Rozelle is a former employee of Zachry and former participant in the Plan under 29 U.S.C. § 1002(7).  Rozelle is a resident of La Porte, Texas.

11.     Myers is a former employee of Zachry and participant in the Plan under 29 U.S.C. § 1002(7).  Myers is a resident of Gautier, Mississippi.

12.     Munson is a former employee of Zachry and participant in the Plan under 29 U.S.C. § 1002(7).  Munson is a resident of Livingston, Texas.

13.     Zachry is a private corporation headquartered in San Antonio, Texas.  Zachry, through its subsidiaries, offers engineering, procurement and construction, plant operation, turnaround, and fabrication services.

14.     The Administrative Committee is the Plan Administrator and is a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002 and 1102.  The Administrative Committee maintains its address at Zachry's corporate headquarters in San Antonio, Texas.  The Administrative Committee and its members are appointed by Zachry's Chief Executive Officer to administer the Plan on Zachry's behalf.

15.     Does No. 1-10 are the members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries to the Plan.  Plaintiffs are currently unable to determine the membership of the Administrative Committee or the identity of

the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Administrative Committee and the identity of any other fiduciaries is not publicly available. As such, these Defendants are named Does 1-10 as placeholders. Plaintiffs will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint to name the members of the Administrative Committee and other responsible individuals as defendants as soon as their identities are discovered.

### III.  JURISDICTION AND VENUE

16.     Plaintiffs seek relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

17.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

18.      Venue is proper in this District pursuant to ERISA Section 502(e), 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Zachry's principal place of business is in this District and the Plan is administered from this judicial district. Furthermore, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

19.     Plaintiffs have standing to bring this action. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan. As explained herein, the Plan has suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by this Court. In addition, although standing under ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiffs and all Plan participants suffered financial harm as a result of the Plan's

imprudent investment options and excessive fees, and were deprived of the opportunity to invest in prudent options with reasonable fees, among other injuries.

## IV. FACTUAL ALLEGATIONS

### A. Background And Plan Structure

20.     The Plan is a participant-directed 401(k) plan, in which participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with the participant contributions, employer matching contributions, any discretionary contributions, and earnings or losses thereon.  The Plan pays Plan expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income.  Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses.  The available investment options for participants of the Plan include various mutual funds and collective investment trusts.

21.     Mutual funds are publicly-traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

22.     Collective trusts are, in essence, mutual funds without the SEC regulation.  Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective trusts

were severely restricted, giving rise to the more transparent and publicly-traded mutual funds. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan. The main advantage of opting for a collective trust, rather than a mutual fund, is that larger retirement plans should be able to leverage their size for lower fees.

23.     During the Class Period, Plan assets were held in a trust by the Plan Trustee, Fidelity Management Trust Company. All investments and asset allocations are performed through this trust instrument.

**B.      Defendants' Breaches of Fiduciary Duties**

24.     As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan. Plaintiffs did not acquire actual knowledge regarding Defendants' breaches at issue here until shortly before the complaint initiating this action was filed.

### 1.      The Plan's Investment in the Fidelity Freedom Funds

25.     Among other investments, the Plan lineup offers a suite of fourteen target date funds. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. Target date funds offer investors dynamic, easy asset allocation, while providing both long-term growth and capital preservation. All target date funds are inherently actively managed, because managers make changes to the allocations to stocks, bonds and cash over time. These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

26.     According to the Plan's Form 5500s,[2] since at least December 31, 2009,[3] the Plan has offered the Fidelity Freedom fund target date suite.  Fidelity Management & Research Company ("Fidelity") is the second largest target date fund provider by total assets.  Among its several target date offerings, Fidelity offers the riskier and more costly Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite").  Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. Defendants failed to compare the Active and Index suites and consider their respective merits and features.  A simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and consequently the more appropriate choice for the Plan.  Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duty by imprudently selecting and retaining the Active suite.

27.     The two fund families (meaning the Active suite and the Index suite) have nearly identical names and share a management team.[4]   But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[5] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in both its

---

[2]The Form 5500 is the annual report that 401(k) plans are required to file pursuant to the reporting requirements of ERISA.
[3]The Form 5500 provides a detailed schedule of the Plan's holdings at the end of each calendar year. The suite of Fidelity Freedom funds appears as a Plan investment option as far back as the 2009 Form 5500, the earliest publicly available filing.
[4]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014.  Finola McGuire Foley was added to the Index suite team in 2018.
[5]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

underlying holdings and its asset allocation strategy. Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

28. Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA"). A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA. The Fidelity Freedom fund with the target year that is closest to a participant's assumed retirement age (age 65) serves as the QDIA in the Plan.

29. Given that the vast majority of plan participants are not sophisticated investors, many of the Plan participants, by default, concentrate their retirement assets in target date funds. As such, the impact of Defendants' imprudent selection of target date funds is magnified vis-à-vis other asset categories. Indeed, by December 31, 2019, approximately 46% of the Plan's assets were invested in the Active suite.

i. The Active Suite is High-Risk and Unsuitable for Plan Participants

30. The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan, and particularly those whose savings were automatically invested through the QDIA. At first glance, the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, which would suggest both target date options have a similar risk profile. However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues.

At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

31.     The goal of an active manager is to beat a benchmark—usually a market index or combination of indices—by taking on additional risk.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan participants in this action.  Actively managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios). These extra costs present an additional hurdle for active managers to clear in order to provide value and compensate investors for the added risk resulting from their decision-making.  Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[6]  Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market.  The Active suite's allocation to primarily actively managed funds subjects investor dollars to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

32.     At all times across the glide path, the Active suite's top three domestic equity positions were and are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their respective lifetimes.  The Intrinsic Opportunities Fund, which is currently allocated 7.95% of the total

[6]"How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

assets in the 2040-2060 Funds, has, over its lifetime, missed its benchmark, the Russell 3000 Index, by an astonishing 299 basis points (2.99%) on an annualized basis.  The Large Cap Stock Fund, which is currently allocated 6.99% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its annualized lifetime returns trail that of its benchmark, the S&P 500 Index, by 369 basis points (3.69%).  The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent approximately 15% of the 2040 through 2060 vintages, meaning for at least 20 years (because those target date funds have an associated target retirement date of at least twenty years from now), 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

33.    Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions. Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take to boost returns.  Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

34.     Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation."  This strategy heaps further unnecessary risk on investors, such as Plan participants, in the Active suite.  A March 2018 Reuters special report[7] on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."  The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."  While many target date fund managers are increasing exposure to riskier investments in an effort to augment performance by taking on additional risk, the president of research firm, Target Date Solutions, states that the Active suite has gone further down this path than its peers.[8]  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities.  Morningstar similarly characterized Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given "carte blanche" to take further risks, to the severe detriment of the Plan and its participants.

35.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the

[7]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.
[8]*Id.*

downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt opines

that the popularity of target date funds derives from investors' belief that the funds are designed

to "not lose money."  As a result, the average unsophisticated investor, such as the typical

participant in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund

offers.  Given this reality, Plan participants should be shielded from the riskiest fund families

where active manager decisions could amplify losses in periods of market decline.  The Active

suite's lack of downside protection has been magnified by the current COVID-19 crisis, and has

been felt most sharply by Plan participants approaching their target date, because Plan

participants close to retirement age do not have ample time to recoup significant losses before

they start withdrawing their retirement savings.  The more conservative Fidelity Freedom Index

2020 Fund has handled the current volatility exceptionally well, with year to date returns through

August 11, 2020 ranking in the 19th percentile among other 2020 target date funds.[9]  In stark

contrast, the Fidelity Freedom 2020 Fund (i.e., part of the Active suite), in which the Plan had

approximately $55.9 million at the end of 2019, ranks in the 56th percentile among the same peer

group.

ii.     The Active Suite's Considerable Cost

36.     Even a minor increase in a fund's expense ratio (the total annual cost to an

investor, expressed as a percentage of assets) can considerably reduce long-term retirement

savings.  The fees charged by the Active suite are many multiples higher than the Index suite's

industry-leading low costs.  While the Institutional Premium share class for each target year of

the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite—

---

[9]For Morningstar's peer group rankings, 1st percentile is the best performers.

which the Plan offered until October 1, 2019—has expense ratios ranging from 42 basis points

(0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

37. Beginning October 1, 2019, Defendants "updated the share classes for the

investment lineup," which included moving from the K share class of the Active suite to the

unlabeled share class to take advantage of the larger revenue credit of the unlabeled share class.

This shift, along with a corresponding change in the way the Plan utilized the revenue credits,

resulted in lower "overall net cost[s]" to participants, but failed to bridge the significant gap to

the Institutional Premium share class of the Index suite.

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Effective ER | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income | FFFAX | 0.12% | Income Inst Prem | FFGZX | 0.08% | -0.04% |
| 2005 | FFFVX | 0.13% | 2005 Inst Prem | FFGFX | 0.08% | -0.05% |
| 2010 | FFFCX | 0.17% | 2010 Inst Prem | FFWTX | 0.08% | -0.09% |
| 2015 | FFVFX | 0.21% | 2015 Inst Prem | FIWFX | 0.08% | -0.13% |
| 2020 | FFFDX | 0.25% | 2020 Inst Prem | FIWTX | 0.08% | -0.17% |
| 2025 | FFTWX | 0.30% | 2025 Inst Prem | FFEDX | 0.08% | -0.22% |
| 2030 | FFFEX | 0.34% | 2030 Inst Prem | FFEGX | 0.08% | -0.26% |
| 2035 | FFTHX | 0.38% | 2035 Inst Prem | FFEZX | 0.08% | -0.30% |
| 2040 | FFFFX | 0.40% | 2040 Inst Prem | FFIZX | 0.08% | -0.32% |
| 2045 | FFFGX | 0.40% | 2045 Inst Prem | FFOLX | 0.08% | -0.32% |
| 2050 | FFFHX | 0.40% | 2050 Inst Prem | FFOPX | 0.08% | -0.32% |
| 2055 | FDEEX | 0.40% | 2055 Inst Prem | FFLDX | 0.08% | -0.32% |
| 2060 | FDKVX | 0.40% | 2060 Inst Prem | FFLEX | 0.08% | -0.32% |

38.     The highest fee of the K share class, which participants in the 2040 through 2060 Active funds paid for the majority of the relevant period, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time.  This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



Portfolio Value From Investing $100,000 Over 20 Years

In 20 years, 0.50% annual fees reduce portfolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

— 4% annual return less 0.25% annual fee
— 4% annual return less 0.50% annual fee
— 4% annual return less 1.00% annual fee

39.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's investment in the K share class of the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $1.75 million in costs.  This tremendous cost difference goes straight into Fidelity's pockets and is paid for by Plan participants.  As the costs for recordkeeping services have dropped precipitously over the past decade,[10] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it recordkeeps, including the Plan.

---

[10] "NEPC: Corporate Defined Contribution Plans Report Flat Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.

### iii.　Investors Have Lost Faith in the Active Suite

40.　The flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large. According to Morningstar's report on the 2019 Target Date Fund Landscape,[11] investor demand for low-cost target date options has skyrocketed in recent years. Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone. At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows. The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years. Defendants' act, in offering and maintaining the Active suite in the Plan, evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

### iv.　The 5-Star Index Suite

41.　Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on." This measurement emphatically favors the Index suite. Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund[12] (other than the Income and 2005 Index Funds, which have the same 3 stars as the Income and 2005 Active Funds). With the exception of the Income, 2005, and 2060 iterations, the full Index suite is assigned 5 stars, Morningstar's highest rating. The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers. The Active suite does not achieve a single 5-star rating, and only receives one 4-star rating. Defendants

---

[11] "2019 Target-Date Fund Landscape: Simplifying the Complex."
[12] Each vintage of the Active suite receives the same exact Morningstar rating for its K shares and unlabeled shares.

were likely aware, or should have been aware, of the higher ratings of the Index suite, yet continued to offer the Active suite, to the detriment of Plan participants.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 3 | Income Inst Prem | FFGZX | 3 |
| 2005 K | FSNJX | 3 | 2005 Inst Prem | FFGFX | 3 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 4 | 2020 Inst Prem | FIWTX | 5 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 3 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 3 | 2035 Inst Prem | FFEZX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 3 | 2055 Inst Prem | FFLDX | 5 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

v.        The Active Suite's Inferior Performance

42.        In the period following the strategy overhaul in 2013 and 2014, the Active suite's higher levels of risk have failed to produce substantial outperformance when compared to the Index suite. While assuming significantly higher levels of risk with investor dollars (and among them, the Plan participants' hard-earned savings), the Active suite has simply failed to measure up to the returns produced by its index cousin, in which the Plan participants' assets would be significantly better off. Since the strategic changes took effect in 2014, the Index suite has outperformed the Active suite in four out of six calendar years. Broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite[13] has substantially underperformed the Index suite on a trailing three- and five-year annualized basis:[14]

---

[13]The unlabeled share class of the Active suite produces slightly worse returns than the K shares due to the unlabeled shares' higher expense.

[14]Investment professionals and investment policy statements for virtually all competently managed defined contribution retirement plans appropriately recognize that the three-year and five-year annualized returns are important metrics for evaluating whether investment options should be maintained in a retirement plan lineup.

| 3-Year Trailing Performance as of 9/30/20 | | | | |
|---|---|---|---|---|
| **Freedom Suite** | **Return** | **Freedom Index Suite** | **Return** | **Difference** |
| Income K | 4.86% | Income Inst Prem | 5.50% | -0.64% |
| 2005 K | 5.24% | 2005 Inst Prem | 5.90% | -0.66% |
| 2010 K | 5.66% | 2010 Inst Prem | 6.34% | -0.68% |
| 2015 K | 6.01% | 2015 Inst Prem | 6.77% | -0.76% |
| 2020 K | 6.32% | 2020 Inst Prem | 7.12% | -0.80% |
| 2025 K | 6.55% | 2025 Inst Prem | 7.37% | -0.82% |
| 2030 K | 6.91% | 2030 Inst Prem | 7.80% | -0.89% |
| 2035 K | 7.08% | 2035 Inst Prem | 8.03% | -0.95% |
| 2040 K | 7.06% | 2040 Inst Prem | 8.02% | -0.96% |
| 2045 K | 7.04% | 2045 Inst Prem | 8.03% | -0.99% |
| 2050 K | 7.03% | 2050 Inst Prem | 8.04% | -1.01% |
| 2055 K | 7.03% | 2055 Inst Prem | 8.02% | -0.99% |
| 2060 K | 7.05% | 2060 Inst Prem | 8.06% | -1.01% |

| 5-Year Trailing Performance as of 9/30/20 | | | | |
|---|---|---|---|---|
| **Freedom Suite** | **Return** | **Freedom Index Suite** | **Return** | **Difference** |
| Income K | 5.43% | Income Inst Prem | 5.22% | 0.21% |
| 2005 K | 6.28% | 2005 Inst Prem | 6.15% | 0.13% |
| 2010 K | 7.04% | 2010 Inst Prem | 6.94% | 0.10% |
| 2015 K | 7.71% | 2015 Inst Prem | 7.71% | 0.00% |
| 2020 K | 8.22% | 2020 Inst Prem | 8.27% | -0.05% |
| 2025 K | 8.65% | 2025 Inst Prem | 8.78% | -0.13% |
| 2030 K | 9.59% | 2030 Inst Prem | 9.83% | -0.24% |
| 2035 K | 10.15% | 2035 Inst Prem | 10.50% | -0.35% |
| 2040 K | 10.16% | 2040 Inst Prem | 10.53% | -0.37% |
| 2045 K | 10.14% | 2045 Inst Prem | 10.54% | -0.40% |
| 2050 K | 10.15% | 2050 Inst Prem | 10.55% | -0.40% |
| 2055 K | 10.15% | 2055 Inst Prem | 10.53% | -0.38% |
| 2060 K | 10.14% | 2060 Inst Prem | 10.55% | -0.41% |

43.     Due to its slightly higher expense, the unlabeled share class of the Active suite produces slightly worse returns than the K shares, and accordingly similarly underperforms the Index suite by the same metrics:

| 3-Year Trailing Performance as of 9/30/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income | 4.81% | Income Inst Prem | 5.50% | -0.69% |
| 2005 | 5.19% | 2005 Inst Prem | 5.90% | -0.71% |
| 2010 | 5.58% | 2010 Inst Prem | 6.34% | -0.76% |
| 2015 | 5.95% | 2015 Inst Prem | 6.77% | -0.82% |
| 2020 | 6.23% | 2020 Inst Prem | 7.12% | -0.89% |
| 2025 | 6.46% | 2025 Inst Prem | 7.37% | -0.91% |
| 2030 | 6.83% | 2030 Inst Prem | 7.80% | -0.97% |
| 2035 | 6.98% | 2035 Inst Prem | 8.03% | -1.05% |
| 2040 | 6.92% | 2040 Inst Prem | 8.02% | -1.10% |
| 2045 | 6.94% | 2045 Inst Prem | 8.03% | -1.09% |
| 2050 | 6.94% | 2050 Inst Prem | 8.04% | -1.10% |
| 2055 | 6.94% | 2055 Inst Prem | 8.02% | -1.08% |
| 2060 | 6.91% | 2060 Inst Prem | 8.06% | -1.15% |
| | | | | |

| 5-Year Trailing Performance as of 9/30/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income | 5.40% | Income Inst Prem | 5.22% | 0.18% |
| 2005 | 6.26% | 2005 Inst Prem | 6.15% | 0.11% |
| 2010 | 6.99% | 2010 Inst Prem | 6.94% | 0.05% |
| 2015 | 7.68% | 2015 Inst Prem | 7.71% | -0.03% |
| 2020 | 8.16% | 2020 Inst Prem | 8.27% | -0.11% |
| 2025 | 8.59% | 2025 Inst Prem | 8.78% | -0.19% |
| 2030 | 9.53% | 2030 Inst Prem | 9.83% | -0.30% |
| 2035 | 10.09% | 2035 Inst Prem | 10.50% | -0.41% |
| 2040 | 10.08% | 2040 Inst Prem | 10.53% | -0.45% |
| 2045 | 10.06% | 2045 Inst Prem | 10.54% | -0.48% |
| 2050 | 10.09% | 2050 Inst Prem | 10.55% | -0.46% |
| 2055 | 10.08% | 2055 Inst Prem | 10.53% | -0.45% |
| 2060 | 10.05% | 2060 Inst Prem | 10.55% | -0.50% |

44.     It is unclear at what point in 2014 the Active suite's major strategic changes were implemented, but using a start date of January 1, June 30, or December 31, 2014, the Index suite has outperformed the Active suite to date.  Investing research and information websites commonly show the growth of $10,000 invested in a mutual fund and a benchmark over a period to provide a comparison of returns in a simple-to-understand format.  Using this method to compare the two suites, at each proposed start date, across every vintage of the fund families, the

Index suite would have earned investors significantly greater sums on a $10,000 investment. Defendants breached their fiduciary duty to Plan participants by choosing to select and retain the Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings.

### 2. The Plan's Objectively Imprudent Investment Options

45.     In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

> $ERi=Rf+\beta i(ERm-Rf)$, where:
>
> $ERi$=expected return of investment
> $Rf$=risk-free rate
> $\beta i$=beta of the investment
> $(ERm-Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively-managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[15]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

---

[15]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.

### i. The Fidelity Mid Cap Stock Fund

46. The Fidelity Mid-Cap Stock Fund[16] has consistently and significantly underperformed its benchmark, the S&P MidCap 400 Index, on a rolling five-year annualized basis:

**5-Year Trailing Performance**

| As of | Performance, adjusted for investment expense | S&P MidCap 400 Index Benchmark | Investment Option Performance/Underperformance Compared to Benchmark |
|-------|-----------------------------------------------|--------------------------------|----------------------------------------------------------------------|
| 4Q2014 | 15.76% | 16.54% | -0.78% |
| 4Q2015 | 10.26% | 10.68% | -0.42% |
| 4Q2016 | 13.92% | 15.33% | -1.41% |
| 4Q2017 | 14.64% | 15.01% | -0.37% |
| 4Q2018 | 5.90% | 6.03% | -0.13% |



[16]The Plan offered the K shares class of the Fund until October 1, 2019, at which point the Plan switched to the unlabeled share class. The performance data for the Fund in this complaint concerns the period from 2014 to 2018, and accordingly represents the returns of the K shares.

47.     When an investment option's track record is so apparently poor, as it is here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard S&P Mid-Cap 400 Index Fund that simply tracks the S&P MidCap 400 Index, with a very low expense ratio of 8 basis points (0.08%) for the Institutional share class.  While participants should have had the option to achieve the index's returns, at minimum, at minimal cost, Defendants' imprudence in retaining the Fidelity Mid-Cap Stock Fund instead forced them to pay 82 basis points (0.82%) to consistently lag the index.  Defendants' failure to replace this underachieving investment option with better performing alternatives was a breach of fiduciary duty.

### 3.     The Plan's Excessive Recordkeeping/Administrative Costs

48.     Another obvious indicator of Defendants' breach of their fiduciary duties is the Plan's excessive recordkeeping costs.  According to one industry publication,[17] the average cost for recordkeeping **and** administration in 2017 for plans much smaller than the Plan (plans with 100 participants and $5 million in assets) was $35 per participant.  As of December 31, 2019, the Plan had approximately $919.5 million in assets and 16,832 participants.  As the cost of recordkeeping services is dependent solely on the number of participant accounts, and given the Plan's size, and resulting negotiating power, with prudent management and administration, the Plan would have unquestionably been able to obtain a per-participant cost significantly lower than $35 per participant.

---

[17]The 401k Averages Book (20th ed.).

49.     For the majority of the pertinent period, Fidelity received compensation for its recordkeeping services to the Plan through revenue sharing payments collected from the Plan's investment options.  As the Plan's total asset level grew in size, due to contributions and the rise of the market, Fidelity received steadily more compensation even though the level of services it provided to the Plan remained constant.  Based on the year-end schedules of assets attached to the Plan's Form 5500s, the Plan paid out the following excessive amounts per head in recordkeeping fees:

| 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|
| $57.84 | $51.02 | $55.19 | $71.65 | $64.91 |

50.     Defendants acted belatedly to cap the amounts the Plan was paying in January 2019 by opting to pay a flat annual fee, albeit at a level that is still unjustifiable for such a large plan.  As of the January 2019 change, Plan participants are charged a $49 annual recordkeeping fee, in addition to a further $11 annually for "Other Administrative Fees."  The total administrative cost of $60 per person is still 71% higher than the average cost for recordkeeping and administration cited above for plans much smaller than the Plan.  Indeed, given its size and negotiating power, the Plan should have been able to negotiate a recordkeeping fee alone of no more than the $14-$21 per-participant figure that Fidelity has itself admitted its recordkeeping services were worth.[18]  The $49 per-participant charge is several times these amounts.  Thus, Defendants clearly engaged in a shocking breach of fiduciary duty by allowing the Plan to pay up to 3.5 times more than it should have paid for such services if they had engaged in any modestly prudent approach to ensuring that the Plan's recordkeeping expenses were fair and reasonable.

---

[18]*Moitoso v. FMR LLC*, No. 18-CV-12122 (WGY), 2020 WL 1495938, at *15 (D. Mass. Mar. 27, 2020).

51.     As such, it is clear that Defendants either engaged in virtually no examination, comparison, or benchmarking of the recordkeeping/administrative fees of the Plan to those of other similarly-sized 401(k) plans, or were complicit in paying grossly excessive fees.  Had Defendants conducted any examination, comparison, or benchmarking, Defendants would have known that the Plan was compensating Fidelity at an inappropriate level for its size.  Plan participants bear this excessive fee burden and, accordingly, achieve considerably lower retirement savings, since the extra fees, particularly when compounded, have a damaging impact upon the returns attained by participant retirement savings.

52.     By failing to recognize that the Plan and its participants were being charged much higher fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

**4.      The Plan's Excessively Expensive Investment Menu**

53.     In another obvious breach of their fiduciary duties, Defendants also failed to monitor the average expense ratios charged to similarly sized plans.  Indeed, participants were offered an exceedingly expensive menu of investment options, clearly demonstrating that Defendants neglected to benchmark the cost of the Plan lineup or consider ways in which to lessen the fee burden on participants during the pertinent period.  Indeed, from 2014 through 2018, the Plan paid out investment-related fees (some of which was allocated to the Plan's recordkeeper, Fidelity) of 0.55%-0.61% of its total assets, considerably more than those of comparable plans.  According to most recent Brightscope/ICI study published in August 2020,

the average total plan fees/cost[19] is 0.38%[20] for plans with between $500 million and $1 billion in assets, such as the Plan at issue in this case. The fact that the Plan was paying total fees of 45%-61% higher than comparable plans from 2014 to 2018 confirms the plain fact that Defendants failed to ensure that the Plan was paying reasonable fees and committed an apparent and significant breach of their fiduciary duties by failing to ensure that the total cost of the Plan was reasonable. Though Defendants updated the Plan's investment menu in 2019, and with it, the method by which participants paid Plan fees, these changes failed to more closely align the Plan's TPC with those of similar plans. The Plan's TPC in 2019 was 0.48% of net assets, a figure still 26% higher than the average that comparable plans paid.

54. A further indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select collective trusts where available. A prudent fiduciary conducting an impartial review of the Plan's investment lineup would have recognized that the Plan could have shaved off a portion of its excessive spend on investment management fees by converting the following fund to a collective trust:

| Fund | Expense Ratio | 2019 Plan AUM | Collective Trust Version | Inception Date | Expense Ratio |
|------|---------------|---------------|--------------------------|----------------|---------------|
| Fidelity Growth Company | 0.83% | $89.4m | Fidelity Growth Company Commingled Pool | Dec. 13, 2013 | 0.43% |
| Fidelity Contrafund | 0.85% | $62.9m | Fidelity Contrafund Commingled Pool | Jan. 17, 2014 | 0.43% |
| Fidelity Mid-Cap Stock Fund | 0.92% | $29.9m | Fidelity Mid-Cap Stock Commingled Pool | May 15, 2015 | 0.45% |

---

[19]Total plan cost ("TPC") refers to the sum of all fees and expenses associated with the operation of a retirement plan; notably, the recordkeeping fees, any other administrative fees, and investment management fees. The TPC permits a straight "apples-to-apples" comparison of the total fees incurred by different plans, as service providers can and do manipulate price reporting by shifting or redirecting their fees to investment management expenses to minimize the billing for recordkeeping and other service components, and vice versa.

[20]This figure is for 2017. Given technological advances and market-based competitive pressures since 2017, the average total plan cost should be even lower today.

55.     During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's substantial assets from the mutual fund into this alternative investment vehicle.  The above collective trusts were comprised of the same underlying investments as its mutual fund counterpart, but charged lower fees.  The Plan did not receive any additional services or benefits based on its use of the more expensive fund; the sole consequence was higher costs for participants.  Defendants' failure to obtain better pricing, or their inexplicable ignorance to the availability of the collective trust vehicle, was a severe breach of fiduciary duty.

56.     Compounding this issue is Defendants' failure to monitor the Plan's investment options to ensure that they were in the least expensive available share class.  There is no distinction whatsoever, *other than price*, between the share classes for the same investment option.  The share class used is typically, if not always, dependent on the negotiating leverage of the investor; in other words, large institutional investors, such as the Plan, have significant amounts of monies to invest such that mutual fund managers will agree to lower fees/offer cheaper share classes for access to those Plan assets.  Despite the negotiating leverage based on the size of the Plan, Defendants neglected to utilize the least expensive share class for the following non-Fidelity fund:

| Fund | 2018 AUM | Exp Ratio | Cheaper Share Class | Exp Ratio |
|------|----------|-----------|---------------------|-----------|
| Invesco Diversified Dividend Fund R5 | $16.5m | 0.51% | Invesco Diversified Dividend Fund R6 | 0.42% |

57.     As long as Defendants continue to refrain from offering the least expensive share class for each investment option in the Plan lineup, participants will suffer harm to their retirement savings through the payment of needless extra fees.  By failing to recognize that the

Plan and its participants were paying higher investment management fees than they should have been and/or failing to take effective remedial actions, Defendants breached their fiduciary duties to the Plan.

## V. ERISA'S FIDUCIARY STANDARDS

58. ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and -
>
> (A) for the exclusive purpose of
>
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;
>
> [and]
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

59. Under 29 U.S.C. § 1103(c)(l), with certain exceptions not relevant here, the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in a plan and their beneficiaries and defraying reasonable expenses of administering the plan.

60. Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

61. ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interests of participants.

62.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C.

§ 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach

by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in relevant

part, as follows:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances:
>
> > (1)    if he participates knowingly in, or knowingly
> > undertakes to conceal, an act or omission of such
> > other fiduciary, knowing such act or omission is a
> > breach; or
> >
> > (2)    if, by his failure to comply with section 404(a)(l) in
> > the administration of his specific responsibilities
> > which give risk to his status as a fiduciary, he has
> > enabled such other fiduciary to commit a breach; or
> >
> > (3)    if he has knowledge of a breach by such other fiduciary,
> > unless he makes reasonable efforts under the
> > circumstances to remedy the breach.

63.    29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to

enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a)

provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches
> any of the responsibilities, obligations, or duties imposed upon
> fiduciaries by this subchapter shall be personally liable to make
> good to such plan any losses to the plan resulting from each such
> breach, and to restore to such plan any profits of such fiduciary
> which have been made through use of assets of the plan by the
> fiduciary, and shall be subject to such other equitable or remedial
> relief as the court may deem appropriate, including removal of
> such fiduciary.

# VI.    CLASS ALLEGATIONS

64.    This action is brought as a class action by Plaintiffs on behalf of themselves and the following proposed Class:

> All participants and beneficiaries in the ZHI 401(k) Retirement Savings Plan (the "Plan") at any time on or after August 21, 2014 to the present (the "Class Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and the Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

65.    This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

66.    **Numerosity**.  Plaintiffs are informed and believe that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

67.    **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiffs and all the members of the Class, including, but not limited to the following:

(a)    Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)    Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)    Whether and what form of relief should be afforded to Plaintiffs and the Class.

68.    **Typicality**.  Plaintiffs, who are members of the Class, have claims that are typical of all of the members of the Class.  Plaintiffs' claims and all of the Class members' claims arise

out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

69. **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent the interests of the members of the Class.  Plaintiffs have no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiffs have retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

70. **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual Class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

71. **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

72. **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never

bring suit individually.  Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

73.     **Manageability**.  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

74.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

75.     Plaintiffs' counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis and there will be no difficulty in managing this case as a class action.

76.     Therefore, this action should be certified as a class action under Rules 23(a) and 23(b)(1) and/or 23(b)(3).

**COUNT I**
**(For Breach of Fiduciary Duty)**

77.     Plaintiffs incorporate by reference the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

78.     Defendants' conduct, as set forth above, violates their fiduciary duties under ERISA § 404(a)(1)(A), (B) and (D), 29 U.S.C. § 1104(a)(1)(A), (B) and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

79.     To the extent that any of the Defendants did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they or it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their or its specific responsibilities giving rise to his, her, their or its fiduciary status and/or knowingly failing to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

80.     As a direct result of Defendants' breaches of duties, the Plan has suffered losses and damages.

81.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, 29 U.S.C. § 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available

equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
### (Failure to Monitor Fiduciaries and Co-Fiduciary Breaches)

82.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

83.     Zachry is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

84.     In light of its appointment and supervisory authority, Zachry had a fiduciary responsibility to monitor the performance of the Committee and its members.  In addition, Zachry, and the Administrative Committee had a fiduciary responsibility to monitor the performance of the members of the Committee.

85.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and participants when they are not.

86.     To the extent that fiduciary monitoring responsibilities of Zachry or the Committee was delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

87.     Zachry and the Committee breached their fiduciary monitoring duties by, among other things:

    (a)  Failing to monitor and evaluate the performance of their appointees or have a
         system in place for doing so, standing idly by as the Plan suffered enormous losses as

a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

88.    As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Zachry and the Committee discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

89.    Zachry and the Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

90.    Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

91.     Plaintiffs incorporate the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

92.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

93.     To the extent any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves, the Class and the Plan, demand judgment against Defendants for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Amended Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

DATED: August 26, 2021                    */s/ Dan E. Martens*
                                          Dan E. Martens (State Bar No. 13050500)
                                          The Law Office of Dan E. Martens
                                          17101 Preston Road, Suite 160 S
                                          Dallas, TX  75248
                                          Telephone: (972) 335-3888
                                          Facsimile: (972)335-5805
                                          Email: dmartens@danielmartens.com

                                          Mark K. Gyandoh
                                          Capozzi Adler, P.C.
                                          312 Old Lancaster Road
                                          Merion Station, PA 19066
                                          Telephone: (610) 890-0200
                                          Facsimile: (717) 233-4103
                                          Email: markg@capozziadler.com

                                          Donald R. Reavey
                                          Capozzi Adler, P.C.
                                          2933 North Front Street
                                          Harrisburg, PA 17110
                                          Telephone: (717) 233-4101
                                          Facsimile: (717) 233-4103
                                          Email: donr@capozziadler.com

James E. Miller
Laurie Rubinow
Miller Shah LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
lrubinow@millershah.com

James C. Shah
Alec J. Berin
Miller Shah LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com
ajberin@millershah.com

Kolin C. Tang
Miller Shah LLP
19712 MacArthur Boulevard
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: kctang@millershah.com

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*

## CERTIFICATE OF SERVICE

I certify that, on August 26, 2021, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system and automatically copied to all counsel of record.

/s/ Dan E. Martens
Dan E. Martens

*Attorneys for Plaintiffs, the Plan
and the Proposed Class*